1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DORIAN DAVIS aka
WALI AT-TAQI DAVIS,

                    Plaintiff,

        v.

A. HEDGPETH,

                    Defendant.

_____/

CASE NO. 1:07-cv-00696-OWW-SKO PC

FINDINGS AND RECOMMENDATIONS
RECOMMENDING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT BE GRANTED

(Doc. 53)

THIRTY-DAY OBJECTION PERIOD

**Findings and Recommendations on Motion for Summary Judgment**

## I.      Procedural History

        Plaintiff Dorian Davis aka Wali At-Taqi Davis, a state prisoner proceeding pro se and in

forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on May 9, 2007.  This

action for damages is proceeding on Plaintiff's amended complaint, filed on May 8, 2008, against

Defendant Hedgpeth for violation of the Eighth Amendment of the United States Constitution.

Plaintiff's claim arises from the denial of outdoor exercise in 2005, 2006, and 2007 while he was

housed at Kern Valley State Prison in Delano, California.[1]

        Defendant filed a motion for summary judgment on January 31, 2011, Plaintiff filed an

opposition on March 18, 2011, and Defendant filed a reply on April 4, 2011.[2]   (Docs. 53, 54, 57,

58, 65, 66, 67.)  The motion has been deemed submitted, Local Rule 230(l), and the Court now

_____

        [1] Plaintiff's due process claim, arising out of the deprivation of other privileges, was dismissed from the
action on March 10, 2010, for failure to exhaust in compliance with 42 U.S.C. § 1997e(a).

        [2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
Court in an order filed on February 17, 2009.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 34.)

1   issues its findings and recommendations.

2   **II.    Defendant's Motion for Summary Judgment**

3        **A.    Legal Standard**

4        Any party may move for summary judgment, and the Court shall grant summary judgment

5   if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

6   to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual

7   Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is

8   disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record,

9   including but not limited to depositions, documents, declarations, or discovery; or (2) showing that

10  the materials cited do not establish the presence or absence of a genuine dispute or that the opposing

11  party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation

12  marks omitted). While the Court *may* consider other materials in the record not cited to by the

13  parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School

14  Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

15       As the moving party, Defendant bears the initial burden of proving the absence of a genuine

16  dispute of material fact. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010)

17  (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)) (quotation marks

18  omitted). Because Plaintiff bears the burden of proof at trial, Defendant need only prove that there

19  is an absence of evidence to support Plaintiff's case. In re Oracle Corp., 627 F.3d at 387 (citing

20  Celotex, 477 U.S. at 326) (quotation marks omitted). If Defendant meets his initial burden, the

21  burden shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues

22  for trial. Id. (citing Celotex, 477 U.S. at 324).

23       In resolving Defendant's motion for summary judgment, all of the evidence must be viewed

24  in the light most favorable to Plaintiff as the non-moving party, Garcia v. County of Merced, 639

25  F.3d 1206, 1208 (9th Cir. 2011); Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011),

26  all reasonable inferences must be drawn in his favor, LVRC Holdings LLC v. Brekka, 581 F.3d

27  1127, 1136 (9th Cir. 2009); Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 763 (9th Cir. 2006),

28  and his response is treated more indulgently because he is the nonmoving party, Lew, 754 F.3d at

1    1423. However, Plaintiff must support his opposition with admissible evidence.

2         Verified pleadings and verified oppositions constitute opposing declarations so long as they

3    are based on personal knowledge and they set forth facts admissible in evidence to which the

4    declarant is competent to testify, Moran v. Selig, 447 F.3d 748, 759-60 (9th Cir. 2006); Jones v.

5    Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir.

6    2000); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); Schroeder v. McDonald, 55

7    F.3d 454, 460 n.11 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per

8    curiam); Lew, 754 F.2d at 1423, with personal knowledge and competence to testify inferable from

9    the declarations themselves, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990)

10   (per curiam) (quotation marks omitted); also Sea-Land Service, Inc. v. Lozen Intern, LLC, 285 F.3d

11   808, 819 (9th Cir. 2002).  Arguments or contentions set forth in an unverified responding brief, on

12   the other hand, do not constitute evidence.  See Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d

13   758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence).  Plaintiff's amended complaint

14   is verified and he submitted a declaration and documentary evidence in support of his opposition.

15   His unverified opposition, however, does not have any evidentiary value.[3]

16        **B.    Evidentiary Objections**

17        In conjunction with his reply, Defendant filed various evidentiary objections.  In light of the

18   legal standard detailed in the previous section and explanations provided in the following sections,

19   the Court declines to individually address the objections, with the exception of the following two

20   objections.

21             **1.    Relevance**

22        Given the Court's duty to determine whether there exists a genuine dispute as to any *material*

23   fact, an independent objection to evidence as irrelevant is both unnecessary and unhelpful.  E.g.,

24   Carden v. Chenega Sec. & Protections Servs., LLC, No. CIV 2:09-1799 WBS CMK, 2011 WL

25   1807384, at *3 (E.D.Cal. May 10, 2011); Arias v. McHugh, No. CIV 2:09-690 WBS GGH, 2010

26   WL 2511175, at *6 (E.D.Cal. Jun. 17, 2010); Tracchia v. Tilton, No. CIV S-06-2916 GEB KJM P,

27

28        [3] Plaintiff filed an opposition and a separate response to Defendant's statement of undisputed facts.  (Docs. 57 and 58.)

2009 WL 3055222, at *3 (E.D.Cal. Sept. 21, 2009); Burch v. Regents of the University of California, 433 F.Supp.2d 1110, 1119 (E.D.Cal. Jun. 5, 2006).  Defendant's objection on relevancy grounds is therefore disregarded.  The Court strongly encourages Defendant's counsel to reconsider burdening the Court with unnecessary evidentiary objections.

## 2.   Authentication

Unauthenticated documents cannot be considered in a motion for summary judgment, Las Vegas Sands, LLC v. Nehme, 632 F.3d 526, 533 (9th Cir. 2011) (citing Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), and therefore, lack of proper authentication can be an appropriate objection where the documents' authenticity is genuinely in dispute.

In resolving Defendant's motion for summary judgment, the Court relies in part upon three documents submitted by Plaintiff: a Program Status Report dated May 30, 2007, a Confidential Memorandum dated May 30, 2007, and a Program Status Report dated June 7, 2007.  These documents are prison records and other Program Status Reports were submitted by Defendant in support of his motion.

An inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility, Orr, 285 F.3d at 776, and documents may be authenticated by review of their contents if they appear to be sufficiently genuine, Las Vegas Sands, LLC, 632 F.3d at 533 (citing Orr, 285 F.3d at 778 n.24) (quotation marks omitted).  No suggestion was made that these documents are not official prison records.  The characteristics of the records themselves in terms of appearance, contents, and substance lead the Court to conclude easily that the documents have been authenticated by their distinctive characteristics and that they are what they appear to be: official prison records. Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533; see also Abdullah v. CDC, No. CIV S-06-2378 MCE JFM P, 2010 WL4813572, at *3 (E.D.Cal. Nov. 19, 2010) (finding an objection for lack of foundation and authentication unavailing where the records were from the plaintiff's prison file and they were created and maintained by prison officials); Sanchez v. Penner, No. CIV S-07-0542 MCE EFB P, 2009 WL 3088331, at *5 (E.D.Cal. Sept. 22, 2009) (overruling lack of foundation and proper authentication objections to prison medical records submitted by the

plaintiff); Johnson v. Roche, No. CIV S-06-1676 GEB EFB P, 2009 WL 720891, at *6 (E.D.Cal. Mar. 13, 2009) (overruling lack of foundation and proper authentication objections to prison records); Burch, 433 F.Supp.2d at 1119 (overruling objections to the introduction of documentary evidence where the defendants did not actually dispute the authenticity of them and where the plaintiff would be able to authenticate them at trial).

If Defendant genuinely disputed the authenticity of these records, he could have made a more specific objection; he failed to do so and his bare objection to Plaintiff's use of prison records for lack of proper authentication is overruled.[4,5]  Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533.  The Court repeats its suggestion that Defendant's counsel give objections due consideration.  They should not be made simply for the sake of being made.

### C.   Plaintiff's Eighth Amendment Denial-of-Exercise Claim

#### 1.   Undisputed Facts[6]

##### a.   General Facts

Defendant Hedgpeth was the warden at Kern Valley State Prison (KVSP) from January 1, 2007, to November 28, 2007.[7]  He was not the warden at KVSP in 2005 or 2006, and therefore, he did not approve or have the authority to approve lockdowns during that time period and he did not develop any policies or procedures relevant to lockdowns during that time period.

During 2007, Defendant approved lockdowns and modified programming that included

---

[4] Given that Defendant submitted the very same record type, albeit from different dates, even a more specific objection would likely be unavailing.

[5] Defendant's hearsay objection to these three documents is also overruled.  Fed. R. Evid. 803(6).

[6] This section is comprised of those facts set forth by Defendant in his statement of undisputed facts which were not brought into dispute by Plaintiff through the submission of admissible evidence.

[7] Although Plaintiff disputes this and attests in his declaration that Defendant was the warden at KVSP until December 2008, he has made no showing that he has personal knowledge of and the competency to testify as to Defendant's dates of employment.  While personal knowledge and competence to testify may be inferable from the declaration itself, here they are not and there are no facts set forth which make the appropriate showing.  Barthelemy, 897 F.2d at 1018.  Therefore, the Court accepts as undisputed the fact that Defendant was the warden at KVSP from January 1, 2007, to November 28, 2007.  Fed. R. Civ. P. 56(c)(4); Shakur v. Schriro, 514 F.3d 878, 889-90 (9th Cir. 2008); Casey v. Lewis, 4 F.3d 1516, 1527 (9th Cir. 1993).

restrictions on outdoor exercise affecting various facilities and populations of inmates at KVSP.[8] The lockdowns and modified programs resulted from serious threats to institutional safety and security, and they enabled staff to conduct investigations into actual incidents of violence and planned assaults discovered by correctional staff.

The lockdowns and modified programming implemented in 2007 were each tailored to specific facilities, specific buildings within facilities, and, in some instances, specific populations depending upon the circumstances that triggered the lockdown.[9]  In prison, normal programming means inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; can attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedule.  During normal programming, the yard population is limited to approximately two hundred inmates at a time.

A modified program typically involves the suspension of various programs or services for a specific group of inmates and/or in a specific part of a facility.  Work and education programs may be suspended; telephone, canteen, or visiting privileges may be restricted; and religious programming may be restricted.  Programs and privileges are restored incrementally, consistent with institutional safety and security concerns.

A lockdown typically involves the restriction of all inmates to their cells or dormitory beds and the suspension of all programs except essential functions.  Lockdowns can be imposed on the entire prison or within a specific facility, and inmate movement is strictly controlled, closely supervised, and under escort with mechanical restraints.  The facility administrator determines

---

[8] Plaintiff attempts to dispute this fact by attesting that Defendant was required to get the approval of the Director.  Whether or not Defendant needed the approval of the Director is not material, but in any event, all lockdowns and modified programming were approved by the Director.  (Doc. 68, Reply, Hedgpeth Dec., ¶4.)

[9] Throughout his response to Defendant's statement of facts, Plaintiff takes issue with the use of the terms lockdowns versus modified programs.  Whether they are called lockdowns or modified programs is immaterial to the resolution of Plaintiff's claim.  What is material is whether Plaintiff was deprived of exercise for a period of time sufficient to implicate the Eighth Amendment and if so, whether Defendant acted with deliberate indifference.  Neither party disputes that outdoor recreation was suspended and it is that condition of confinement which is at issue here.  Unless otherwise noted, where Plaintiff purports to dispute a fact based on the use of the term lockdown versus modified program but he either fails to cite to admissible evidence or misconstrues the fact and then attempts to bring it into dispute through that misconstruction, that fact is included in this section without further explanation.  The Court accepts, for the purposes of resolving this motion, that the modified programs at issue were restrictive.

whether critical inmate workers in the affected housing units will be permitted to attend their work assignments under escort, and inmates are not released except on a case-by-case basis.[10]

Lockdowns are generally imposed after serious threats to institutional security and the safety of inmates and staff, and in a prison setting, they are necessary when correctional officers discover evidence or receive information from confidential informants that violence or disruptions are being planned by some inmates against other inmates or staff. California Department of Corrections and Rehabilitation (CDCR) policies and procedures direct that when a serious incident occurs, the priorities are: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames.[11] After the initial incident response is completed, the incident is assessed and programming is determined. If the incident is serious, it may be necessary to modify or restrict program activities for some or all of the inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program. If a lockdown or modified program is necessary, a Program Status Report (PSR) is developed to ensure that both staff and inmates know what is expected. Services deemed essential are maintained, and the lockdown plan is reviewed regularly and revised as needed.

Correctional officers take all threats of violence and disruption seriously, but there is greater concern if there is evidence or information that attacks or disruptions may be part of a greater scheme because it could lead to a larger-scale riot situation, creating a more serious threat to the safety and security of the prison. A lockdown may be necessary in response to actual violence such as an attack on an inmate or a correctional officer so that prison staff can investigate and ascertain whether the violence is part of a planned or concerted effort by a group of inmates against others. If the threat

---

[10] Plaintiff denies that inmates are released on a case-by-case basis and states that they are released when their group is released, but he fails to cite to any evidence in support of his denial which is, in any event, immaterial.

[11] Although Plaintiff attempts to deny this fact and the next fact by arguing that approval by the Director is required and procedures were not followed, that objection is not responsive to either fact and it does not bring them into dispute.

of violence rises to an unusually high level and prison staff cannot determine or identify the source of the threat so as to remove the inmates planning the disruption or violence, a lockdown may be necessary to prevent assaults or further planning activities.

During a lockdown, the safety and security concerns of the inmates and staff, and the duty to investigate and to determine the causes of the disturbances or acts or violence, compel prison officials to enforce restrictions within the facility, which may include but are not limited to suspension of outdoor exercise, canteen, telephone, and regular visits.

Once a lockdown is declared, the process of investigating and gathering intelligence begins. The facility is searched, including the common areas, dining halls, janitorial rooms, cells, and outside yards, and the search includes digging up the ground to search for weapons that may have been hidden for later use. Facility staff and inmates are interviewed to gather intelligence about the incident and to determine whether it is safe to return to normal programming. During the investigation, staff communicate regularly with other institutions and CDCR headquarters to determine whether it is safe to return to normal programming. Other institutions may also interview their inmates and monitor inmate communications for related intelligence.

CDCR's policy is to return to normal programming when it is safe to do so. Gathering information about the causes of violence that has occurred or the plans for committing acts of violence is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents. As a result, lockdowns are generally released in stages. An incremental unlock plan is developed to return to full programming. The resumption of normal program activities occurs when the majority of regularly scheduled staff members are present. Inmates are released, and privileges restored, incrementally. Small groups of inmates may be released to the dayroom and the recreation yard, where staff can observe their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. If another incident occurs during the unlock process, previously released inmates may be locked down again so an investigation of the new incident can be completed. If it is determined that returning to regular programming would pose too great a risk, the modified program may be continued.

1    During a lockdown or modified program, there are weekly mandatory meetings with the
2  Warden or Chief Deputy Warden, the Facility Captain, the Associate Warden, the Use of Force
3  Coordinator, and any line staff member with relevant information.  The attendees discuss the
4  progress of the investigation, the status of the lockdown, and the development of a plan to resume
5  normal programming.  The Associate Director of Institutions is apprised of the status of the
6  lockdown via weekly PSRs and bi-weekly conference calls.

7    The investigative process and the process of releasing inmates from a lockdown may include
8  inmate "representatives" for the purpose of allowing them to speak with other inmates about the
9  lockdown and any ongoing disputes between ethnic groups.  Other efforts may include attempts to
10  mediate any underlying dispute among the groups.  Failing to provide this balance during the phased
11  lockdown can increase the likelihood of race-based violence, even if the incident causing the
12  lockdown was not between groups of inmates or race-based.

13    Of all the normal programming activities suspended during a lockdown, it is most difficult
14  to determine when outdoor exercise programs can be safely resumed.  Because inmates have the
15  greatest access to each other on the exercise yards, that is typically where most inmate-on-inmate
16  assaults occur.  It is commonly known that if violence is going to occur during the phased unlock
17  or shortly after the lockdown ends, it typically occurs on the exercise yard.

18    In determining when and how to safely resume outdoor exercise programs after a
19  lockdown/modified program, Defendant had to consider numerous factors, including that during
20  normal programming, the number of inmates on a yard greatly outnumbered prison staff assigned
21  to monitor them and the self-imposed ethnic divisions that could be linked to the incident that caused
22  the lockdown, or which could trigger further violence, were especially pronounced on the exercise
23  yards due to various ethnic groups claiming areas of the yard as their turf.  These factors affected
24  decisions on the timing and scope of resuming outdoor exercise so as to best ensure the safety of
25  correctional officers and inmates.

26  ///

27  ///

28

**b.**   **Specific 2007 Lockdowns/Modified Programs**

KVSP is a Level IV, 180-degree maximum security prison organized into five primary facilities: A, B, C, D, and E.  Based on an inmate's commitment offense and in-prison behavior, inmates classified as Level IV are deemed to pose the highest security-level threat.  During 2007, Plaintiff was housed at KVSP in Facility D from January to sometime in March 2007, and in Facility A for the rest of the 2007.[12]

Plaintiff's right to exercise would only have been affected by the lockdowns/modified programs that impacted (1) the building in the facility where he was housed and (2) the population or group to which he belonged.  In 2007, Plaintiff attests that he was affected by the following lockdowns/modified programs: February 14, 2007, October 24, 2007, and December 8, 2007.[13] (Doc. 57, Opp., Davis Dec., ¶17.)

On February 14, 2007, a riot occurred between black and white inmates on the yard of Facility A.  On the same day, a homicide occurred in Facility A.  All facilities and housing units at the prison were placed on modified program for twenty days pending completion of the investigation into both serious incidents.[14]

On October 24, 2007, officers received confidential information that black inmates affiliated with disruptive groups were conspiring to assault staff in Facility A.  Black inmates and inmates housed with black inmates in Facility A were placed on modified program for seven days pending completion of the investigation into the threat.

On October 26, 2007, officers received information that inmates were conspiring to introduce narcotics and contraband into KVSP.  Facilities A, B, C, and D were placed on modified program

---

[12] The precise date Plaintiff transferred to Facility A has not been established, but it was sometime in March 2007.

[13] Defendant was not the warden in December 2008 and that lockdown/modified program is therefore not at issue and is not discussed further.  Another lockdown/modified program was implemented on October 26, 2007, which Plaintiff acknowledges "eclipsed" the October 24th lockdown/modified program, and that event is included. (Response to Fact 47, p. 7.)

[14] Plaintiff denies this fact on the ground that the modified program lasted one-hundred ten days.  This fact is undisputed to the extent that Defendant meant the modified program was initially for twenty days.

for sixteen days to complete the detailed and systematic search of those facilities and conclude the investigation.

The 2007 lockdowns/modified programs that affected Plaintiff were the result of acts by inmates such as a riot between inmates on the facility yard, the murder of an inmate, conspiracy to assault correctional staff, and conspiracy to introduce narcotics and contraband into the prison.[15] Based on his experience and the information provided to him by correctional staff, Defendant determined that the violent activities underlying the lockdowns/modified programs at issue posed serious threats to institutional safety and security. The lockdowns and restrictions on recreational activities in Facility A and Facility D in 2007 were approved to ensure the safety and security of inmates and staff, and to enable prison staff to investigate the unusually high level of violence, disruption, planned violence, and murder by inmates.

The investigation into the incidents triggering the lockdowns was time consuming and labor intensive. Correctional officers interviewed inmates, sometimes more than once given inmates' reluctance to speak with or disclose information to staff. The yards, cells, common areas, and other areas of the prison were searched thoroughly for evidence, weapons, and contraband. Mail was also screened for any information concerning planned violence. Each piece of evidence or information obtained from either searches or interviews was examined and all leads were followed, often creating the need for additional searches and interviews. Officers shared the information and evidence gathered with staff at other prisons and CDCR headquarters to determine whether the inmates were acting in concert with inmates at other prisons.

Defendant met regularly with other CDCR officials to evaluate information gathered, reevaluate all lockdown conditions, and discuss the status of the lockdowns, as well as consider return to normal operations as quickly and safely as possible. Without a thorough investigation into the conduct that triggered each of the lockdowns, Defendant would not have been able to make decisions to accommodate coming off of lockdown in a way that would minimize further eruptions of violence during the unlock process.

---

[15] Although Plaintiff purports to deny this fact, he fails to cite to any evidence bringing this fact into dispute.

1     When investigations yielded some certainty that further violence would not ensue, Defendant

2  implemented a gradual and incremental return to normal programming with the eventual end to the

3  lockdown and return to normal programming.  This enabled Defendant to monitor and assess

4  whether the phased unlock could safely continue.  For each lockdown, Defendant believed that the

5  restrictions imposed, including the restriction on recreational activities, would be effective in

6  stopping the violence and in helping to restore order.

7          **2.**    **Legal Standard**

8     "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must

9  not involve the wanton and unnecessary infliction of pain.'"  Morgan v. Morgensen, 465 F.3d 1041,

10  1045 (9th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)).  The

11  Eighth Amendment, which protects prisoners from inhumane conditions of confinement, Farmer v.

12  Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994), is violated when prison officials act with

13  deliberate indifference to a substantial risk of harm to an inmate's health or safety, e.g., Farmer, 511

14  U.S. at 828; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Richardson v. Runnels, 594

15  F.3d 666, 672 (9th Cir. 2010).

16     Two requirements must be met to show an Eighth Amendment violation.  Farmer, 511 U.S.

17  at 834.  First, the deprivation must be, objectively, sufficiently serious.  Id. (quotation marks and

18  citation omitted).  The objective component is contextual and responsive to contemporary standards

19  of decency.  Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995 (1992) (quotations marks and

20  citation omitted).  Extreme deprivations are required to make out an Eighth Amendment conditions-

21  of-confinement claim.  Hudson, 503 U.S. at 9 (quotation marks and citation omitted).  Because

22  routine discomfort is part of the penalty that criminal offenders pay for their offenses against society,

23  only those deprivations denying the minimal civilized measure of life's necessities are sufficiently

24  grave to form the basis of an Eighth Amendment violation.  Id. (quotation marks and citations

25  omitted).

26     Second, prison officials must have a sufficiently culpable state of mind, which for conditions-

27  of-confinement claims is one of deliberate indifference.  Farmer, 511 U.S. at 834 (quotation marks

28

omitted).  Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety.  Farmer, 511 U.S. at 837 (quotation marks omitted).  Thus, prison officials may be held liable under the Eighth Amendment for denying humane conditions of confinement only if they know that inmates face a substantial risk of harm and they disregard that risk by failing to take reasonable measures to abate it.  Id. at 847 (quotation marks omitted).

Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. Thomas, 611 F.3d at 1151-52.  There is no bright line in terms of how many hours of out-of-cell exercise per week satisfy the Constitution.  Noble, 636 F.3d at 527 (no outdoor exercise or other privileges for approximately fifteen months); Hebbe v. Pliler, 627 F.3d 338, 343-44 (9th Cir. 2010) (inmate permitted out of his cell for only eight hours a week and impermissibly required to choose between exercise and law library access during those hours); Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months); Pierce v. County of Orange, 526 F.3d 1190, 1211-13 (9th Cir. 2008) (at least two days a week for at least two hours total per week sufficient exercise); LeMaire, 12 F.3d at 1457-58 (no out-of-cell exercise for most of a five-year period); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (in-cell confinement for almost twenty-four hours a day and forty-five minutes of outside exercise per week for a six-week period); Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (fewer than five hours of exercise per week and no outdoor exercise for some inmates over a period of years).  Short-term, temporary deprivations of exercise without medical effects are not sufficiently serious to support an Eighth Amendment claim, Thomas, 611 F.3d at 1155; Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010); May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997); Allen, 48 F.3d at 1088, but the deprivation of exercise for a period of six weeks can support a claim, Allen, 48 F.3d at 1088.

### 3.   Discussion

Plaintiff submitted no admissible evidence to bring into dispute the fact that Defendant was the warden at KVSP from January 1, 2007, to November 28, 2007.  As a result, Plaintiff's claim is limited to the denial of exercise that occurred during that time period.  Three lockdowns are at issue:

February 14, 2007, October 24, 2007, and October 26, 2007.  (Davis Dec., ¶17; Response to Fact 47, p. 8.)

### a.   <u>February 14, 2007</u>

#### 1)   <u>Facts</u>

On February 14, 2007, a riot occurred on the upper yard of Facility A between black and white inmates, and a murder took place in a housing unit in Facility A.  (Doc. 53, Motion, Ex. 9.)  As a result, a modified program was put in place on February 15, 2007, pending completion of an investigation.  (<u>Id.</u>)  All inmates on Facilities A, B, C, and D were affected, and among other restrictions, outdoor exercise was suspended.  (<u>Id.</u>)  Plaintiff was in Facility D when the modified program was initiated and he moved to Facility A in March, at which time Facility A was apparently still on modified program.  (Opp., Ex., court record p. 36.)

While Defendant states that the modified program lasted twenty days, the lockdown ultimately lasted approximately one-hundred ten days.  (Davis Dec., ¶4, 10, 12; Opp., Ex. pp. 35, 36.)  On May 30, 2007, a PSR update was issued.[16]  (Pl. Ex. P. 36.)  At that point, only black and white inmates on Facility A in housing units 1-8 were on modified program and outdoor exercise was still suspended.  On June 7, 2007, another PSR update was issued and normal recreation was resumed for the lower yard for black and white inmates.  (Pl. Ex., p. 35.)

The May 30th PSR update provided:

> On Thursday, February 15, 2007, Facility A was placed on Modified Program Status, due to two separate riots between Black and White inmates.  On March 21, 2007, a systematic search of the Facility and the interview process w[ere] completed.  Additionally, numerous isolated incidents have occurred involving Black and White inmates.  In addition, controlled meetings have been held with both groups to afford them the opportunity for resolution.  On May 19, 2007, normal visiting was initiated and as of this date no incidents have occurred.  Based on the aforementioned, a controlled return to normal program will be initiated.  Facility A will continue Modified Program Status, for the Black and White inmates, pending further assessments.

(Pl. Ex. p. 36.)  An attached memorandum provided further information, including the statement that yard, vocational programs, dayroom, and canteen remained suspended pending further review.  (<u>Id.</u>,

---

[16] It is not clear if other PSR updates were issued prior to May 30, 2007.  Plaintiff provided only two PSR updates and Defendant provided none.

p. 37.)

The June 7th PSR update provided:

On Thursday, February 15, 2007, Facility A was placed on Modified Program Status, due to two separate riots between Black and White inmates. On March 21, 2007, a systematic search of the Facility and the interview process w[ere] completed. Additionally, numerous isolated incidents have occurred involving Black and White inmates. In addition, controlled meetings have been held with both groups to afford them the opportunity for resolution. As of June 6, 2007, normal visiting, education, [and] inmate workers utilization [have] occurred without incidents. Based on the aforementioned, a controlled return to normal program will be initiated. Facility A will continue Modified Program Status, for the Black and White inmates, pending further assessments.

(Pl. Ex. p. 35.)

A memorandum also accompanied this PSR, but it was not provided by Plaintiff. At this point, outdoor recreation resumed. (Id.)

### 2)   Objective Element - Sufficiently Grave Condition

Defendant does not contend that Plaintiff was not subjected to conditions sufficiently grave to form the basis of an Eighth Amendment claim. The lockdown lasted approximately one-hundred ten days, and Plaintiff alleges the lack of exercise caused him medical problems. Therefore, limited to the resolution of this motion, the Court assumes without deciding that the deprivation at issue was sufficiently grave to satisfy the objective element of an Eighth Amendment claim.

### 3)   Subjective Element - Deliberate Indifference

Plaintiff did not submit any evidence bringing into dispute that lockdowns/modified programs are imposed in response to serious threats to institutional safety or security, or that they are necessary when prison staff discover, through either evidence or the receipt of information, that inmates are planning violence against staff or other inmates or other disruptions. Plaintiff also did not bring into dispute the measures that are undertaken in investigating incidents or planned incidents, that the lockdowns/modified programs are reviewed regularly and revised as needed, that CDCR policy provides for the return to normal programming as soon as possible, or that lockdowns/modified programs are released in stages. Nor did Plaintiff refute Defendant's evidence that prison officials have the most difficulty determining when outdoor exercise can be safely restored because if violence is going to occur during a phase of the unlock, it typically occurs on the

exercise yard.  As a result, exercise is one of the last programs to be restored.

Plaintiff argues that Defendant failed to get the approval of the Director in imposing modified programming and that modified programs were in fact lockdowns.  Defendant supports his reply with a showing that he obtained the Director's approval for all modified programs, but this issue is immaterial.  Whether identified as modified programs or lockdowns, the issue is limited to whether outdoor exercise was suspended and if so, for how long and why.  While state regulations may distinguish between the two terms and establish various applicable rules or requirements, Plaintiff's claim is premised on a violation of the Eighth Amendment, not the violation of state regulations.

Plaintiff is not affiliated with a disruptive group and he also argues that the failure to distinguish between affiliated and non-affiliated inmates with respect to restrictions resulting from the activities of disruptive groups was improper.  (Resp. to Facts 31-35, 43, 45.)  Plaintiff further argues that once the participants were identified and segregated, the investigations entailed unnecessary practices that were uncalled for, and Defendant had alternatives to the total denial of outdoor exercise, including the use of the "concrete small yard."  (Resp. to Facts 51, 57; Davis Dec., ¶¶9, 11.)

Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights.  Bell v. Wolfish, 441 U.S. 520, 545-46, 99 S.Ct. 1861 (1979) (citation and quotation marks omitted); also Hudson v. Palmer, 468 U.S. 517, 524, 104 S.Ct. 3194 (1984).  It is well-established that the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions, and prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security.  Bell, 441 U.S. at 545-46 (quotation marks omitted); also Whitley v. Albers, 475 U.S. 312, 321-22, 106 S.Ct. 1078 (1986); Rhodes v. Chapman, 452 U.S. 337, 348-51, 101 S.Ct. 2392 (9th Cir. 1981); Noble, 636 F.3d at 529; Norwood, 591 F.3d at 1066.

A prisoner's right to outdoor exercise is neither absolute and indefeasible nor does it trump all other considerations.  Norwood, 591 F.3d at 1068.  Prison officials have a duty to ensure the

16

safety and security of inmates and staff, and this imperative must be balanced against other legal obligations, including outdoor exercise. Id. at 1069.  Prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost, id. (quotation marks and citation omitted), and they are entitled to wide-ranging deference in their discharge of this responsibility, so long as that deference does not manifest deliberate indifference or an intent to inflict harm, Noble, 636 F.3d at 529.

KVSP is a Level IV institution that houses those inmates classified at the highest security level.  The lockdown/modified program was instituted in response to two riots and a homicide, which indisputably constituted an emergency situation and which initially led to the lockdown of four out of five facilities.  Prison officials conducted an investigation and slowly eased the restrictions as they deemed appropriate, with exercise privileges necessarily being one of the last to be restored.  The process took approximately one-hundred ten days to complete, but Defendant has provided evidence describing the level of detail involved and the need to reestablish programs and privileges in phases, with outdoor exercise being the most challenging to restore because it carries the greatest risk of violence following the lift of the suspension.  The Court is not in the position to lightly second-guess the expert judgment needed to make these decisions, Norwood, 591 F.3d at 1069, or otherwise micromanage prisons, Noble, 636 F.3d at 531.

Although Plaintiff argues that prison officials should have taken steps to ensure that non-affiliated inmates such as himself would not have been affected for so long and that they should have considered other alternatives to provide outdoor exercise, Plaintiff offers only his bare, lay opinion on these issues.[17] Regardless, Plaintiff's disagreement with how prison officials responded to the riots would not raise a triable issue of fact under these circumstances.  Defendant had a duty to restore order following the riots and to ensure Plaintiff's safety while doing so, along with the safety of the other inmates and correctional staff.  Noble, 636 F.3d at 529-31; Norwood, 591 F.3d at 1069-70.  His response to the threats presented was well within the wide-ranging discretion to which he

---

[17] Plaintiff has no expertise in prison management and he may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge.  Fed. R. Evid. 701, 702.  Plaintiff is limited to testifying on admissible matters to which he has personal knowledge and the competency to testify.

is entitled.  Noble, 636 F.3d at 529-31; Norwood, 591 F.3d at 1069-70.

There is simply no evidence raising a genuine dispute as to any material fact regarding the need for the lockdown/modified program or the need to lift the lockdown in measured phases, with the restoration of outdoor exercise necessarily being one of the last programs to be restored.  Noble, 636 F.3d at 531; Norwood, 591 F.3d at 1070.  In short, there is no evidence that Defendant acted with deliberate indifference in approving the one-hundred ten day modified program.  Noble, 636 F.3d at 531.  Accordingly, the Court finds that Defendant did not violate Plaintiff's Eighth Amendment rights and it recommends that Defendant be granted judgment as a matter of law on Plaintiff's claim arising out of the February 14, 2007, modified program.

### b.    October 24, 2007/October 26, 2007

#### 1)    Facts

On October 24, 2007, black inmates on Facility A, housing units 1-8, were placed on modified program following the receipt of information that black inmates affiliated with disruptive groups were conspiring to assault staff on Facility A.  Then on October 26, 2007, all inmates on Facilities A, B, C, and D were placed on modified program following the receipt of information that inmates were conspiring to introduce narcotics and contraband into the prison.  Outdoor recreation was suspended pursuant to both modified programs.  It is not clear from the record how long the modified programs lasted, but Defendant was not the warden after November 28, 2007, and another modified program was implemented approximately six weeks later, on December 8, 2007.  Although Plaintiff denies Defendant's claim that the October 26th modified program only lasted sixteen days, Plaintiff fails to provide evidence of a different end date, if it lasted longer than sixteen days. (Response to Fact 47, p. 8.)  The result, however, is the same whether the total period under both modified programs lasted eighteen days (beginning the 24th and including the sixteen-day period commencing the 26th) or six weeks (the date of the next lockdown/modified program).

The initial modified program PSR for October 24, 2007, provided:[18]

On Wednesday, October 24, 2007, confidential information was received implicating

---

[18] Neither party provided an updated PSR and it is not clear if one was issued or not.

that Black inmates affiliated with disruptive groups were conspiring to assault staff on Facility A.   Based on the aforementioned information, the Black inmate population on Facility A will be on Modified Program Status, pending the completion of an investigation into this matter.   The Gym inmates will not be affected by the aforementioned, and will continue Normal Program Status.

(Motion, Ex. 7.)   The modified program applied to all black inmates and other inmates housed with

black inmates in housing units 1 through 8 on Facility A.   (Id.)

The initial modified program PSR for October 26, 2007, provided:

On Friday, October 26, 2007, at approximately 0800 hours, information was received that Inmates are conspiring to introduce narcotics and contraband into Kern Valley State Prison.   Meetings will be held with staff to inform them of a detailed and systematic search plan of all facilities.   E-yard is excluded from the searches.

(Motion, Ex. 10.)   The modified program applied to all inmates on Facilities A, B, C, and D.   (Id.)

**2)**      **Deliberate Indifference**

In light of the fact that KVSP was on and off modified program status throughout 2007 and because Defendant does not argue to the contrary, the Court assumes but does not decide that the deprivation of outdoor exercise pursuant to the October 24th and October 26th modified programs met the objective element of an Eighth Amendment claim.   (Doc. 53-3, Hedgpeth Dec., ¶¶27-36.)

With respect to the subjective element, there is no evidence raising a genuine dispute as to any material fact regarding the necessity of these lockdowns/modified programs in light of the receipt of information that the safety and security of the institution was at risk due to the planned assault on staff and then the introduction of narcotics and contraband into the prison.   Both events necessitated investigations and determinations that the lockdowns/modified programs could be lifted and normal programming could safely resume.   The Court declines to second-guess these decisions or to determine that the length of the modified program(s) exceeded what was reasonably necessary to conclude the investigations and resume normal programming.   Noble, 636 F.3d at 529-31; Norwood, 591 F.3d at 1069-70.   Defendant is entitled to judgment as a matter of law on Plaintiff's claim arising from the denial of outdoor exercise resulting from the October 24/October 26, 2007, modified programs.

**4.**      **Qualified Immunity**

Defendant also argues that he is entitled to qualified immunity.   For the reasons previously

set forth, the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims against him.  Alternatively, Defendant is also entitled to qualified immunity.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, ___, 129 S.Ct. 808, 815 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); Delia v. City of Rialto, 621 F.3d 1069, 1074 (9th Cir. 2010); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009).  While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances.  Pearson, 555 U.S. at ___, 129 S.Ct. at 818 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Delia, 621 F.3d at 1074-75; Mueller, 576 F.3d at 993-94.

Even as of 2011, it has not been clearly established how or when prison officials must lift a lockdown or modified program implemented in response to threats to the safety and security of the institution arising from riots or information that inmates plan to assault staff and introduce narcotics and contraband into the prison.  Noble, 636 F.3d at 529; Norwood, 591 F.3d at 1070.  In light of the undisputed evidence regarding the reasons for the lockdowns/modified programs, the investigatory steps that must be undertaken in responding to the events, and the need to lift the lockdowns/modified programs in stages depending upon the results of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in

conjunction with the lockdowns/modified programs at issue here was unlawful.  Defendant is therefore entitled to qualified immunity.

**III.   Recommendation**

For the reasons set forth herein, the Court HEREBY RECOMMENDS that Defendant Hedgpeth's motion for summary judgment, filed January 31, 2011, be GRANTED as follows:

1.   Defendant is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim; and

2.   In the alternative, Defendant is entitled to qualified immunity.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    August 1, 2011**                            /s/ Sheila K. Oberto
                                                UNITED STATES MAGISTRATE JUDGE

21